**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-378-TJK-2** |
| **PAUL RAE,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Paul Rae to 24 months' imprisonment, 36 months' supervised release, restitution in the amount of $2000, and the mandatory assessment of $125. The government recommends a twelve-month upward variance because Rae knew about the certification taking place on January 6, 2021, joined the hand-selected group of Proud Boys who pledged to follow leadership's commands no matter what and discussed violently storming the Capitol—and then acted in accordance with those plans, breaching the Capitol together with his compatriots and opposing police efforts to quell the unrest.

I.     **INTRODUCTION**

As set forth in the Statement of Offense (ECF No. 205), Rae prepared for and then engaged in persistent efforts to interfere with police officers at the Capitol and disrupt the Electoral College certification on January 6. Rae prepared for and took these actions as part of a hand-selected group

of Proud Boys members[1] that openly discussed its plans for violence at the Capitol and intention to confront police who might try to stand in their way. *See, e.g.*, *id.* at ¶¶ 15-22.

On January 6, Rae and his associates followed through, and Rae was at the forefront of the breach of the Capitol during several critical moments. He was among the first group of rioters that forced their way through the police lines and onto Capitol grounds. *Id.* at ¶¶ 32-34. Also in the initial minutes of the riot, Rae joined Proud Boys leaders Ethan Nordean and Joseph Biggs and numerous others they had led to the Capitol (including Gilbert Fonticoba) in their effort to tear down a fixed metal fence and unleash the masses on a thin line of police officers. *Id.* ¶¶ 35-38.

While on Capitol grounds, Rae encouraged the crowd around him by waving them forward and shouting, "Push forward, guys!", and celebrated the crowd's efforts with other Proud Boys, exclaiming "All I want to do is be violent and have Trump as my president." *Id.* ¶¶ 40-41.

After nearly an hour on Capitol grounds, when police appeared to regain control over the toward the Capitol building, eventually scaling a concrete wall to access stairs to the Capitol. *Id.* ¶¶ 45-51. Rae then joined other Proud Boys, including Joseph Biggs, as they were among the first wave of rioters to enter the Capitol building as Members of Congress were still in session, one minute after the initial breach. *Id.* ¶ 52.

Rae filmed his entrance into the building, stating, "This is insane. Let's go find Nancy Pelosi! Let's go find Pelosi!" *Id.* ¶ 53. He encouraged other rioters to loot a small canteen inside the building, stating, "Hey, help yourselves, guys. It's on the house!", then exited the building a

---

[1] As discussed herein and set forth fully in the Statement of Offense (ECF No. 205), the Ministry of Self Defense ("MOSD") was a hand-selected group of "rally boys" who vowed to follow the commands of Proud Boys leadership.

few minutes later after approaching a line of police officers and repeatedly exclaiming, "they're arresting people." *Id.* ¶¶ 55-56.

But Rae's escapades in the Capitol did not end there; after regrouping with other Proud Boys on the east side of the Capitol, Rae and Biggs entered the building a second time, pushing their way through the Rotunda Doors. *Id.* ¶¶ 57-59. Rae then remained in the Rotunda for nearly half an hour with other Proud Boys before finally exiting the building. He then posed for a celebratory photograph on Capitol grounds with his fellow Proud Boys, holding up an American flag that his co-defendants Eddie George, Jr. and Arthur Jackman had stolen from a corridor near the Senate Gallery. *Id.* ¶¶ 60-63.

Rae's rampage had a purpose: He breached the Capitol grounds and building, helped destroy the black metal fence, and interfered with officers who were trying to stop the crowd's advance because he intended to obstruct the Electoral College certification and police's efforts to defend the building. And Rae took these actions in concert with others who shared in his criminal purpose, including his four co-defendants in this case, as well as other Proud Boys. *See United States v. Ethan Nordean, et al.*, No. 21-cr-175 (TJK) at ECF No. 855-2 (Gov't Sentencing Memorandum for Ethan Nordean) and ECF No. 855-3 (Gov't Sentencing Memorandum for Joseph Biggs); *United States v. Fonticoba*, No. 21-cr-638 (TJK) at ECF No. 57 (Gov't Sentencing Memorandum for Gilbert Fonticoba).

For the reasons outlined herein, Rae's calculated and coordinated conduct on January 6 warrants the imposition of a significant upward variance from the applicable Guidelines range. Accordingly, the government recommends that the Court sentence Rae to 24 months of incarceration for his convictions of violating 18 U.S.C. §§ 231(a)(3) and 1752(a)(1).

## II.    FACTUAL BACKGROUND

The government refers the court to the Statement of Offense filed in this case, ECF No. 205, for a short summary on the January 6, 2021 attack on the United States Capitol by hundreds of rioters in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### Paul Rae and the Proud Boys

Paul Rae is a 41-year-old resident of the state of Florida. As of January 6, 2021, Rae was the President of the "Trigger City" chapter of the Proud Boys, which was based in the Tampa, Florida area. The Proud Boys describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." Proud Boys members routinely attend rallies, protests, and other events, some of which have resulted in violence involving members of the group. There is an initiation process for new members of the Proud Boys, and members often wear black and yellow polo shirts or other apparel adorned with Proud Boys logos and slogans to public events.

Through at least January 6, 2021, Enrique Tarrio was the national chairman of the Proud Boys organization. Throughout the United States, there are local Proud Boys chapters, which are typically led by chapter "presidents." Each chapter has a degree of autonomy insofar as the president of a local chapter governs that chapter in its geographic location.

### Rae's Plans to Travel to Washington, D.C. on January 6

On December 19, 2020, former President Trump announced plans for a Stop the Steal protest event in Washington, D.C., on January 6, 2021, which date coincided with Congress's Certification of the Electoral College vote. Tarrio and a handful of other members of the Proud

Boys created a new chapter for the Proud Boys that would consist of members from across the country. The new chapter was referred to as the Ministry of Self Defense or MOSD ("MOSD"). Tarrio described the MOSD as a "national rally planning" chapter that would include only "hand selected members." *United States v. Nordean*, 21-cr-175 (TJK), Trial Ex. 500-69 (Exhibit 1). On December 27, 2020, Rae was invited to join the MOSD by Tarrio.

Leaders and members of the MOSD began to discuss plans to travel to Washington, D.C. on January 6, 2021. In messages exchanged among members of the MOSD on Telegram, members discussed the potential for violence at the Capitol on January 6.

On January 3, 2021, the following exchange took place in the "Ministry of Self-Defense – MAIN":

Gabriel PB:        1776 flag flying over the White House last night.

The Vidivic:        ?

John Rackham:  Gonna be war soon ……

Gabriel PB:        Yes Sir time to stack those bodies in from of Capitol Hill

[…]

E-Geezy
[Edward George, Jr]:



[…]

BrotherHunter

> Jack Phillips:     Also this ♮.  So are the normies and "other" attendees going to push thru police lines and storm the capitol buildings?  A few million vs A few hundred coptifa should be enough.  I saw a few normie groups rush through police lines on the 12th.

> Deplorable51:     cue the music…….."let the bodies hit the floor let the bodies hit the floor 🎶"

Exhibit 2.

Later on January 3, 2021, a different MOSD member posted a video message in which he remarked that the people effecting the stolen election had been "caught" and that by persisting, they were "gonna make the whole country stand up and fuckin' do bad things to bad people." *United States v. Nordean*, 21-cr-175 (TJK), Trial Ex. 507-12 (Exhibit 3).

On January 4, 2021, members of the MOSD exchanged additional messages that discussed attacking the Capitol on January 6, 2021. One MOSD member posted, "what would they do [if] 1 million patriots stormed and took the capital building. Shoot into the crowd? I think not." In response, one of the leaders of the MOSD wrote, "They would do nothing because they can do nothing." *Id.*, Trial Ex. 507-16 (Exhibit 4).

On January 4, 2021, Rae posted to the MOSD group chat[2]: "I think we need to talk to all of our chapters on the ground about all of our guys carrying a medical emergency card with the info I posted. Everyone should have this info in one of your back pockets. Let all of your brothers know on the ground. Medics on the ground will be looking for this card if you are unconscious or disoriented. Dr. S ☝ " Rae also posted about communications equipment for use on January 6: "I have a BaoFeng and can use some help programming it tonight if you can help with that." Exhibit 5.

---

[2] Rae used a Telegram account with ID# 792631195.

On January 5, 2021, MOSD leader Joe Biggs sent a Telegram chat to a group called "Boots on the Ground" that said: "Just trying to get our numbers.   So we can plan accordingly for tonight and go over tomorrow's plan."   Approximately 14 minutes later, when asked where he was, Biggs stated: "At Paul raes place now." *United States v. Nordean*, 21-cr-175 (TJK), Trial Ex. 512-3 (Exhibit 6).

Rae was with Nordean and Biggs at a gathering of Proud Boys in a rented home in Washington, D.C. on the evening of January 5. Rae understood that Congress was meeting the next day to certify the electoral vote, Rae understood that Vice President Pence would be at the Capitol on January 6.

Messages were subsequently posted on Telegram that advised Proud Boys in Washington, D.C. to meet at the Washington Monument at 10 a.m. on January 6. Participants in the MOSD Telegram group were told that "[Ethan Nordean] is in charge, cops are the primary threat, don't get caught by them or BLM, don't get drunk until off the street." Members were told not to wear Proud Boys colors and instead to "[c]ome out [] as patriot!"

### *Rae's Participation in the January 6, 2021 Capitol Riot*

Rae and Nordean stayed together with a handful of other individuals at the rented home in Washington, D.C. on the evening of January 5. On the morning of January 6, 2021, Rae and Nordean traveled to the National Mall together and met a group of approximately one hundred Proud Boys members near the Washington Monument shortly after 10 a.m.   As instructed, Rae did not wear any Proud Boys colors. Rae wore a dark grey jacket and a black trucker-style hat with cream-colored mesh sides.

Shortly after 10 a.m., Proud Boys Ethan Nordean and Joseph Biggs marched the group

away from the rally that was taking place near the Washington Monument. Nordean announced to the group that they were going to march to the Capitol. The group began marching east toward the Capitol. As the group marched toward the Capitol, Nordean and Biggs addressed the men, including Rae, through a megaphone—telling them that in their view the police and government had failed them. As the group walked past the west side of the Capitol at approximately 11:20 a.m.—more than an hour prior to the initial breach—Nordean announced, "We represent the spirit of 1776. If you haven't noticed, real men are here. We know what the oath is [unintelligible] to support and defend the Constitution . . . Let us remind those who have forgotten what that means."

A few minutes later, as the group marched past U.S. Capitol Police officers at approximately 11:28 a.m., Biggs gave the group of officers the middle finger, and the men marching with Biggs taunted them, yelling "treason," and warning the officers, "don't make us go against you."   The marching group, including Rae, continued to the east side of the Capitol. As the group stood on the east side of the Capitol, a Proud Boys member named Daniel Lyons Scott yelled out, "let's take the fucking Capitol." Scott was chastised and told not to "say" that.

Shortly before noon, Nordean and Biggs led the men, including Rae, back to the west side of the Capitol to a group of food trucks located at approximately 2nd Street and Constitution Avenue NW, arriving at approximately 12:10 p.m. There the group stopped and waited for approximately thirty minutes. At approximately 12:45 p.m., fifteen minutes before the certification of the Electoral College vote was scheduled to start, Nordean mustered the men, including Rae, into a column and marched them back towards the Capitol.

Rae and the marching group arrived at the Peace Circle, at the edge of the restricted portion of Capitol grounds, at approximately 12:50 p.m. Prior to their arrival, the Peace Circle was

uncrowded and relatively peaceful. The First Street pedestrian entrance to the Capitol, which was approximately 100 feet away, was guarded by a handful of Capitol Police officers. Prominent signs posted on metal barriers at the pedestrian entrance and other locations stated, "AREA CLOSED By order of the United States Capitol Police Board."

Upon arriving at the Peace Circle, Biggs led the crowd in chants that included "USA!," "Where's Antifa", and "Whose Capitol? Our Capitol!" At 12:53 p.m., approximately one minute after Biggs led the "Whose Capitol? Our Capitol!" chant, the crowd surged forward towards a police barricade. The crowd, including many of the Proud Boys that Rae had marched with, quickly overwhelmed the line of officers at the barricades. The crowd trampled the barricades and advanced toward the Capitol building.

At approximately 12:54 p.m., after moving past the trampled police barricades, Rae ran up the Pennsylvania walkway on the restricted grounds of the Capitol.



*Figure 1: Rae indicated in yellow*

Law enforcement officers retreated from the gates near the Peace Monument and attempted to form a police line to stop the rioters from advancing to the building. Rae was among the first to arrive at the next police line. Rae was surrounded by other Proud Boys from Florida, including Zachary Johnson, Dion Rajewski, and Steven Miles.[3]



*Figure 2: Rae circled in yellow*

The outnumbered law enforcement officers moved behind a waist high black metal fence and attempted to reform a police line to stop the crowd from advancing. Rae and the other members

---

[3] Johnson, Rajewski, and Miles have all been charged separately for their participation in the January 6 riot. Johnson has pled guilty to Assaulting a Federal Officer Using a Dangerous Weapon in violation of 18 U.S.C. § 111(a)(1) and (b) and has been sentenced to forty-two (42) months of imprisonment. *United States v. Johnson*, No. 22-cr-11-RJL-1. Rajewski has been charged with Interfering with Law Enforcement During a Civil Disorder in violation of 18 U.S.C. § 231 and associated misdemeanors, including Entering and Remaining in a Restricted Building or Grounds with a Deadly and Dangerous Weapon in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A). *United States v. Rajewksi*, No. 22-cr-11-RJL-2. Miles has pled guilty to Assaulting a Federal Officer in violation of 18 U.S.C. § 111(a)(1) and has been sentenced to twenty-four (24) months of incarceration. *United States v. Miles*, No. 22-cr-136-JMC-1.

of the crowd moved forward and briefly stopped at the waist-high black metal fence that had been bolted into the ground. Law enforcement officers commanded the members of the crowd to stop advancing on the Capitol and disperse.

At approximately 12:55 p.m., with officers on the other side of the fence, Nordean, Biggs, and other rioters grabbed the black metal fence and began shaking it.

During this time, Rae was positioned approximately 10-15 feet north of Nordean and Biggs, i.e., to their left as they faced the officers. Rae looked over to his right at Nordean, Biggs, and others; noticing what they were doing, he began to rock and shake the fence panel located directly in front of him. *See* Exhibit 7.[4]



*Figure 3: Screenshot of Exhibit 7 at 0:40; Rae circled in yellow*

---

[4] The government's video exhibits to this sentencing memorandum (Exhibit 7-10) are being submitted to the Court and counsel of record via USAfx.

By rocking the fence back and forth, Rae broke the section of fence in front of him loose from its posts. The crowd, including Rae, was ultimately successful in tearing the fence to the ground, allowing them to advance on the police line toward the Capitol building. Rae moved to his right and trampled another section of fence as he advanced into the West Plaza of the Capitol toward law enforcement officers, who were forced to retreat.



*Figure 4: Screenshot of Exhibit 8 at 0:09*

Rae defied officers' commands to disperse. Rae continued into the West Plaza of the Capitol and stayed in close proximity to Nordean and Biggs. Rae was among the first wave of rioters into the West Plaza. As Rae approached a line of law enforcement officers, he waved other rioters forward to join him at the line, stating "Push forward, guys! Push forward!"



*Figure 5: Screenshot of Exhibit 9 at 0:03*

While on the West Plaza, Rae filmed his surroundings on his cell phone, including members of the crowd calling police "traitors" and "fucking pigs" and chanting "we want in." As he was filming, Rae stated, in part, "All I want to do is be violent and have Trump as my president." Exhibit 9.

From his position near the front of the crowd, Rae saw rioters assault law enforcement using chemical spray and hand-to-hand violence. Law enforcement eventually deployed less-than-lethal tactics to repel members of the crowd.

At approximately 1:21 p.m, Rae, Nordean, Biggs, and others moved away from the police line and began to regroup on the west lawn of the Capitol. While standing on the west lawn of the Capitol at approximately 1:28 p.m., Rae appeared in a selfie-style video filmed by Joe Biggs. The following statements were captured in this video:

Biggs:        So, we just stormed the fucking Capitol!    Took the motherfucking place back.    [laughter]    That was so much fun!    Woo!

Individual 1:   So much America!    So much America!

Rae:              We have war boners!

Biggs:            January 6 will be a day in infamy!



*Figure 6: Rae circled in yellow*

At approximately 1:44 p.m., Rae began to move back toward the Capitol building with Nordean, Biggs and the other men from Biggs' selfie-style video. The group again formed a stack formation and moved forward through the crowd to an area at the base of a set of concrete stairs that led to the Upper West Terrace. The image below shows the group near the base of the concrete stairs. Rae is circled in yellow.



*Figure 7: Rae circled in yellow*

In the area at the base of the concrete stairs, Rae joined dozens of other Proud Boys who had marched to the Capitol behind Nordean and Biggs. The nearby concrete stairs led to the Upper West Terrace, which abutted the Capitol building and many doors and entrances to that building. A small group of outnumbered officers guarded the entrance to the stairs. Scott, the Proud Boy who had marched with Rae and the other Proud Boys to the Capitol, initiated a push by shoving two officers and pushing them up the stairs. Almost instantaneously thereafter, the crowd overwhelmed the officers and pushed up the scaffolding.

Rae, Jackman, and others climbed up the stairs and underneath the scaffolding. However, law enforcement began to deploy less-than-lethal tactics against the rioters who were under the scaffolding, and Rae and Jackman descended the stairs. Rae and Jackman backed away from the scaffolding area. They reunited with Nordean, Biggs, Nordean, N. Tuck and K. Tuck on the lawn just north of the concrete stairs and scaffolding. From that position, they watched as the crowd eventually overwhelmed the line of officers and surged through the scaffolding and up the concrete stairs toward the Capitol building. Upon seeing the crowd advance toward the building, Rae and Biggs rushed back to the concrete stairs in an attempt to advance to the Capitol.

At approximately 2:10 p.m., Rae climbed a concrete wall to join other rioters who were advancing toward the Capitol building on the concrete stairs. In the image below, Rae can be seen looking on as Biggs climbs up the exterior of the wall.



*Figure 8: Rae circled in yellow*

16

Biggs and Rae advanced up the staircase together to the Upper West Terrace near the Senate Wing Door of the Capitol.

By approximately 2:13 p.m., the windows to the left and right of the Senate Wing Door had been shattered. Glass littered the ground both outside and inside the Capitol. The Senate Wing Door had been forced open, and a high-pitched alarm was ringing in the doorway. Vice President Pence was moved out of the Senate Chamber by members of his Secret Service detail. Within minutes of the rioters' entry into the building, the certification proceedings in the Senate were put into recess. The certification proceedings in the House continued until approximately 2:29 p.m. when the House was also put into recess.

Rae filmed his entrance into the Capitol through the Senate Wing Door approximately one minute after the door was initially opened. *See* Exhibit 10. In his cell phone video, Rae can be seen facing the camera, selfie-style, outside the building; a few seconds later, the camera turns around to film rioters climbing in through broken windows. *Id.* at 0:00-0:12. As Rae entered the building, other rioters were chanting "Our House!" and a loud chirping alarm was sounding in the doorway. *Id.* at 0:12-24. Once inside, Rae continued to film the chaos. Rae stated, "This is insane. Let's go find Nancy Pelosi! Let's go find Pelosi!" *Id.* at 0:32-0:36. Another rioter warned that there was "tear gas" being used in the building. *Id.* at 1:17. Video from Closed Circuit Cameras inside the building also captured Rae's entrance into the Capitol with Biggs, as shown in the still capture below.



*Figure 9: Rae circled in yellow*

Rae continued to film on his phone as he entered a small canteen close to the Senate Wing Door and encouraged other rioters to take drinks from it, stating "Hey, help yourselves, guys. It's on the house. Help yourselves!" *Id.* at 0:45-52. Rae took a bottle of water. *Id.* at 1:00.

Rae and Biggs advanced further into the building as they moved from the west side to the east side of the Senate wing. As Rae and Biggs approached a line of law enforcement officers, Rae repeatedly exclaimed, "they're arresting people." *Id.* at 1:55-2:00. Rae continued filming as he and Biggs proceeded through corridors on the Senate side of the building, then exited the building through the Senate Carriage Door on the east side of the building at approximately 2:17 p.m., a few minutes after their initial entry.

Shortly before 2:40 p.m., Rae and Biggs regrouped with Jackman and Proud Boys Kevin Tuck and Eddie George, Jr. on the east side of the Capitol. The group posed for selfie photographs, including the one seen below.

18



*Figure 10: Rae circled in yellow*

Officers on the east side of the building attempted to stop the crowd from breaching the building near the Columbus Doors. The rioters eventually overwhelmed the officers at the doors. At approximately 2:40 p.m., Rae pushed into the Capitol building a second time through the Rotunda Door on the East side of the building, following behind Biggs, George, Jackman, and Kevin Tuck.

Rae became separated from Biggs, George, Jackman, and Kevin Tuck after entering the building. Rae walked toward the Rotunda and quickly met up with Nordean. Nordean and Rae then joined Proud Boys members Nicholas Ochs and Nicholas DeCarlo, who had entered the building separately. Rae entered the Rotunda with Nordean, Ochs, and DeCarlo; and Rae and Nordean then reunited with Nathaniel Tuck. Rae remained in the Rotunda with Nordean and Nathaniel Tuck until approximately 3:10 p.m. While in the Rotunda, Rae observed rioters berating police officers while they attempted to control the flow of the crowd in the Rotunda.



*Figure 11: Rae circled in yellow*

Rae exited the building at approximately 3:12 p.m. through the Rotunda door, as Nordean followed him with his hand on Rae's shoulder.



*Figure 12: Rae circled in lower right*

20

After exiting the building, Rae and Nordean reunited with other Proud Boys on the lawn of the Capitol. Rae posed for a photograph on Capitol grounds with Biggs, Nordean, Jackman, both Tucks, and George. In the photograph, below, Rae can be seen holding an American flag that George and Jackman had stolen from a corridor near the Senate Gallery.



*Figure 13: Rae circled in yellow*

## III.    THE CHARGES AND PLEA AGREEMENT

On May 29, 2024, a federal grand jury returned a Third Superseding Indictment charging Paul Rae with seven counts: violations of 18 U.S.C. §§ 1512(c)(2) and 2; 18 U.S.C. §§ 1361 and 2; 18 U.S.C. § 231(a)(3); 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G).   On August 28, 2024, Rae pled guilty pursuant to a plea agreement to Counts Two and Eleven, charging violations of 18 U.S.C. § 1752(a)(1) and 18 U.S.C. § 231(a)(3), respectively.

## IV.    STATUTORY PENALTIES

Rae now faces sentencing on those two counts. As noted by the plea agreement and the Presentence Report (PSR) issued by the U.S. Probation Office, Rae faces up to 5 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory $100 special assessment on Count Eleven. He further faces up to one year of imprisonment, a fine of $100,000, a term of supervised release of not more than one year, restitution, and a mandatory $25 special assessment on Count Two.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The PSR correctly sets forth the Guidelines calculations. *See* PSR ¶¶ 137-162:

Count Two: 18 U.S.C. § 1752(a)(1)

|  |  |  |
|---|---|---|
| U.S.S.G. § 2B2.3 | Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A) | Trespass at restricted building | +2 |

Count Eleven: 18 U.S.C. § 231(a)(3)

|  |  |  |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |

**Total**                                                                                      **10**

**Multiple Count Adjustment**                                                          **+2**

Counts Two and Eleven do not group, which results in an increase of 2 levels from the highest offense level (Count Eleven), under U.S.S.G. § 3D1.4. This results in an Offense Level of 12.

**Combined Offense Level**                                                              **12**

Acceptance of responsibility (U.S.S.G. § 3E1.1)                                -2

**Total Adjusted Offense Level:**                                                      **10**

*See* Plea Agreement at ¶ 4(A).

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. The parties agreed, and the PSR correctly noted, that Rae is not eligible for an adjustment because he used violence in connection with the offense. *See* U.S.S.G. § 4C1.1(a)(3); PSR ¶ 161; Plea Agreement ¶ 4(C).

The U.S. Probation Office calculated Rae's criminal history as category I, which is not disputed. PSR ¶ 168. Accordingly, based on the government's calculation of Rae's total adjusted offense level, after acceptance of responsibility, at 10, Rae's Guidelines imprisonment range is 6 to 12 months' imprisonment. Rae's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

### **Upward Variance**

After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c). Because Rae's Guidelines range does not capture the unprecedented and uniquely harmful nature of his crimes, which struck at the heart of our democracy and the rule of law, the government respectfully requests that the Court depart or vary upwards from the top of the Guidelines range.

Rae was an avid and willing participant in an unprecedented crime. He joined a mob that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, injured more than one hundred police officers and resulted in more than 2.9 million dollars in losses. His offense targeted the peaceful transfer of power, an essential government function, and one of the fundamental and foundational principles of our democracy.

Like every member of the mob, Rae "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *United States v. Brock*, 94 F.4th 39, 59 (D.C. Cir. 2024). As Judge McFadden put it to another rioter, "[Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources." *United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent'g Tr. 9/22/22 at 86-87.

But nothing in Rae's Guidelines calculation reflects these facts. Rae would face the same offense level if his crimes had not endangered the democratic process or interfered with the peaceful transfer of power.[5] There is no specific offense characteristic in the Guidelines for attacking democracy or abandoning the rule of law. "And simply saying, yeah, I know I trespassed, I trespassed, that's not really capturing the impact of what that day meant when all of those members of Congress met there to fulfill their constitutional duty." *United States v. Calhoun*, 21-CR-116-DLF, Sent. Tr. at 85. So a sentence within Rae's Guidelines range here would not "reflect the seriousness of the offense," "promote respect for the law," or "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented

---

[5] The D.C. Circuit's holding in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024), finding that certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's recent decision in *Fischer v. United States*, 603 U.S. 480 (2024), demonstrates that even the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See Fischer*, 603 U.S. at 506 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

disruption of the nation's most sacred function—conducing the peaceful transfer of power. "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75-RDM, Sent. Tr., at 67.

But just as the history books will describe the crimes of January 6, so will they tell the story of how this nation responded. Future generations will rightly ask what this generation did to prevent another such attack from occurring. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime. As this Court recently put it, "[W]hat a dangerous precedent the attack on January 6 set. What a Pandora's Box it opened. We still don't [know] how corrosive it will prove to be to our constitutional order, at least until we have reestablished the practice of a peaceful transfer of power." *United States v. Sparks*, 21-CR-87-TJK, Sent. Tr. at 94.

Indeed, even before the Supreme Court's decision in *Fischer v. United States*, 603 U.S. 480 (2024), judges of this Court gave significant upward departures and/or variances in January 6 cases when they found the advisory guideline range inadequate. *See, e.g.*, *United States v. Hale-Cusanelli*, 21-CR-37-TNM, 9/22/22 Sent. Tr.; *United States v. Christian Secor*, 21-CR-157-TNM, 10/19/22 Sent. Tr.; *United States v. Hunter and Kevin Seefried*, 21-CR-287-TNM. 10/24/22 Sent. Tr.; *United States v. William Watson*, 21-CR-513-RBW, 3/9/23 Sent. Tr.; *United States v. Riley Williams*, 21-CR-618-ABJ, 3/23/23 Sent. Tr.; *United States v. Hatchet Speed*, 22-CR-244-TNM, 5/8/23 Sent. Tr.

Since *Fischer*, judges have similarly sentenced defendants to account for the disparity

25

between the guidelines and the actual context. For example, in *United States v. Sparks*, 21-cr-87-TJK, this Court sentenced a defendant with an advisory guidelines range of 15-21 months to 53 months' imprisonment. In doing so, the Court applied U.S.S.G. §§ 5K2.7 and 5K2.21 and noted that the jury had found that the defendant had the corrupt intent to interfere with Congress. Because Sparks' advisory guideline range was driven by the § 231 conviction, that range did not "account for the defendant's intent to obstruct, not just law enforcement officers doing their duty under that statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function. Sentencing Tr. at 94-95. And "not any proceeding, but one foundational to our country's governance." *Id.* at 93. The court found Sparks' intent to "interfere or obstruct with the electoral college vote certification . . . plays an important role in explaining why" Sparks' advisory guideline range did not fully account for his criminal conduct. *Id.* at 94.

Other judges have recognized this disparity too. *See United States v. Robertson*, 21-cr-34-CRC (imposing an upward departure because the conduct resulted in a significant disruption of government); *United States v. Dunfee*, 23-cr-36-RBW (imposing an upward departure because the guidelines no longer adequately captured the defendant's intent to stop the peaceful transfer of power).

While the Supreme Court's decision in *Fischer* has changed defendant's advisory Guideline range, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety. To reduce [defendant's] sentence . . . would require this Court to take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392-RCL, ECF 507, at 4-5 (cleaned up).   Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence

that establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining whether . . . the resulting guideline range fully accounts for the criminal conduct." *Sparks* Sentencing Tr. at 95. *See also United States v. Kelly*, 21-CR-708-RCL, ECF 151, at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-CR-6-TJK, Sent. Tr. at 16 ("given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward -- even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense.")

Because the seriousness of Rae's crimes is not adequately captured by the applicable Guideline, an upward variance is warranted. An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up). While the Supreme Court's decision in *Fischer* prompted the government to dismiss the charge under 18 U.S.C. § 1512(c)(2) in this case, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety. To reduce [defendant's] sentence . . . would require this Court to take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392-RCL, ECF 507, Sent. Tr. at 4-5 (cleaned up).  Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence that establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining whether . . . the resulting

guideline range fully accounts for the criminal conduct." *Sparks* Sentencing Tr. at 95. *See also United States v. Kelly*, 21-CR-708-RCL, ECF 151, Sent. Tr. at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-CR-6-TJK, Sent. Tr. at 16 ("given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward -- even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense.")

In past sentencings, this Court has made clear its view that January 6 was "corrosive … to our constitutional order, at least until we have reestablished the practice of a peaceful transfer of power." *Sparks*, Sent. Tr. at 94. Those were not merely empty words—they were a recognition of the seriousness and unprecedented nature of the riot.

Also unprecedented is the need for January 6 sentences to promote respect for the law and deter future crime. *See* 18 U.S.C. § 3553(a)(2)(A), (B). The January 6 rioters went far beyond merely breaking the law. "There is a difference between breaking the law and rejecting the rule of law." *See* Opening Remarks, January 6 Select Committee (Rep. Kinzinger).[6]

In this case, the government submits that an upward variance of 12 months is warranted to reach an appropriate sentence. As discussed below, this Court has sentenced similarly situated defendants who acted with corrupt intent to influence an official proceeding to around 48-57 months.

---

[6] Available at https://www.cnn.com/2021/07/27/politics/read-kinzinger-remarks-0727/index.html

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

As in all cases, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As described in extensive detail in Section II of this memorandum, the nature and circumstances of Rae's crimes threatened to create a constitutional crisis, were rife with violence and credible threats of violence, and militate strongly in favor of a substantial sentence of incarceration. Rae's actions were concerted and purposeful, aimed at halting the certification. Rae understood that Congress was meeting at the Capitol on January 6 to certify the electoral vote, and he knew that Vice President Pence would be at the Capitol on January 6. *Id.* ¶ 21. Nevertheless, in the lead-up to January 6, Rae joined a group of men who were undertaking extensive efforts to amass and direct force and violence against the Capitol. On January 6, he personally joined in bringing those plans to fruition, remaining close to other Proud Boys throughout the day and contributing to the violence of the riot.

Throughout his time at the Capitol, Rae documented and celebrated the group's achievements in videos and photographs he took and posed for together with other Proud Boys. In one video he filmed on the West Front of the Capitol, at the height of the riot, Rae explicitly tied his preparations for violence with his intent to obstruct the Electoral College certification, stating, "All I want to do is be violent and have Trump as my president." *Id.* ¶ 41. He also threatened lawmakers involved in the proceeding, shouting "Let's go find Nancy Pelosi! Let's go find Pelosi!," *id.* ¶ 53.

The sentence imposed by this Court must reflect the seriousness of Rae's crimes.

29

## B.  Rae's History and Characteristics

On January 6, 2021, Rae was president of his local chapter of the Proud Boys. In joining the Proud Boys, and then holding a leadership role within the organization, Rae chose to affiliate himself with a group that celebrated and promoted violence, as reflected in the group's discussions preparing for violence on January 6. Rae contributed to the group's violence at the Capitol, and in the aftermath of the day's events, he continued to celebrate their forceful opposition of the police, posing for photographs with fellow Proud Boys and proudly displaying a stolen American flag. *See* ECF No. 205 at ¶ 63.

Although Rae's Guidelines calculation does not reflect the application of any criminal history points, he does have a criminal history that demonstrates a lack of respect for the rule of law. Most recently, in October 2021, Rae was charged with Boating Under the Influence, though he pled guilty to the lesser offense of Reckless Operation of a Boat. As an adult, he also pled no contest to reckless driving in 2004, and in 2009 was arrested on domestic violence charges that were later dropped.

Rae's history and characteristics weigh in favor of a lengthy term of incarceration.

## C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Rae's conduct on January 6 was the epitome of disrespect for the law.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, although Rae has a criminal history category of I, his history of arrest and conviction shows a lack of respect for the law. *See* Section VI(B) *supra.* Second, although Rae has entered a guilty plea, he has not made meaningful statements of remorse regarding his conduct on January 6.

Finally, the need for both general and specific deterrence is also especially strong because of Rae's choice of target (the Constitutionally-mandated certification of a democratic election) and Rae's participation in a criminal collective. *See Callanan v. United States*, 364 U.S. 587, 593 (1961) (noting that a "partnership in crime—presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality").

All of these favors weigh heavily in favor of a lengthy term of incarceration.

### E.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances."

*United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7]  "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[8] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

As discussed in Section V *supra*, in *United States v. Sparks*, 21-cr-87-TJK, this Court sentenced a defendant with an advisory Guidelines range of 15-21 months to 53 months' imprisonment (roughly 2.5 times the top of the Guidelines range), noting that the jury had found that the defendant had the corrupt intent to interfere with Congress. Because Sparks' advisory Guidelines range was driven by the § 231 conviction, that range did not account for Sparks' corrupt intent to obstruct the Electoral College certification.

The Guidelines are similarly inadequate in this case, where, as discussed in Section VI.A, *supra*, Rae was aware of the proceedings taking place in Congress on January 6, 2021, but he

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

nevertheless joined in the efforts of a group that spoke about bringing violence to Capitol Hill that day. His own words tie his preparation for and willingness to engage in violence with his intent to obstruct the certification proceedings: "All I want is to be violent and have Trump as my president." And Rae delivered on his violent rhetoric, pulling down a fence and enabling the mob to overrun the police line on the West Front, just as Sparks engaged in violence by chasing officers through the Capitol building. Rae entered the building just one minute after Sparks (the first rioter to enter the building that day), and unlike Sparks, he reentered the building a second time after police forced him out the first time. Given the similarities between Sparks and Rae, the government recommends an upward variance of similar magnitude in this case to the upward departure Sparks received. The government recommends a sentence of double the top of the Guidelines range (just shy of the 2.5 times the top of the Guidelines this Court applies in *Sparks*)—i.e., 24 months' imprisonment.

This Court has sentenced other Proud Boys who were with Rae during the events of January 6. This case warrants a significantly higher sentence than the one this Court imposed in *United States v. Healion*, No. 23-cr-230 (TJK): 100 days' incarceration. Unlike Rae, who helped to tear down an in-ground metal fence, Healion did not engage in property destruction. Rae zealously joined in the destruction of a fence in the critical first minutes of the riot—helping to clear the path for the mob to descend on officers and the Capitol. Healion, by contrast, attempted to pull a bike rack from officers over one hour after the initial breach of Capitol grounds—well after the riot had taken hold. Likewise, Rae was among the first wave of rioters into the building at approximately 2:14 p.m.—once again leading and emboldening others to invade the building and stop the Certification. And, immediately after entering, Rae encouraged others to "find Pelosi"—a

particularly chilling statement and revealing of Rae's awareness of the events of the day. In contrast, Healion entered the building at 2:53 p.m., after hundreds of rioters had stormed the building and Congress had been forced to stop its work. Indeed, by the time Healion had entered the building, Rae had entered the building a second time, at approximately 2:40 p.m., joining Biggs, his co-defendants, and a mob overrunning a handful of officers who were desperately attempting to resecure the Columbus Doors on the east side of the Capitol.

Most significantly, however, Rae's conduct warrants a higher sentence than Healion's because Rae explicitly called for political violence tied to the Electoral College certification ("All I want is to be violent and have Trump as my president"; "Let's go find Pelosi!"). And his calls for violence could be expected to carry weight with other Proud Boys, given Rae's position of leadership as president of his local Proud Boys chapter.

A more suitable comparator to this case is *United States v. Fonticoba*, No. 21-cr-638 (TJK), in which this Court sentenced Gilbert Fonticoba to 48 months of incarceration. Fonticoba breached the Capitol grounds and building side-by-side with Rae, and he joined Rae, Nordean, and Biggs in helping to destroy the black metal fence. Like Rae, he acted in concert with members of Proud Boys who shared in his criminal purpose, including members of the MOSD group chat who discussed preparations for violence on January 6. Fonticoba was convicted after a stipulated bench trial of obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2) and civil disorder in violation of 18 U.S.C. § 231(a)(3). At the time of sentencing, 48 months represented a small downward departure from the Guidelines calculation, which was driven by the § 1512(c)(2) charge. But crucially, this Court explicitly stated that it would give the same sentence even if the § 231 charge—which had the same Guidelines range as the § 231 charge in this case, *see id.*, ECF

No. 57 (Sentencing Memorandum) at 7—"was the only count of conviction," citing the defendant's admitted "intent to obstruct the proceeding and the nature of the proceeding itself." *Id.*, Sent. Tr. at 66.

The government recognizes that unlike Fonticoba, Rae has not explicitly admitted to intending to obstruct the Electoral College certification, and accordingly it has proposed a significantly lower sentence here. But the need to avoid "unwarranted" disparities between Fonticoba and Rae—who shared a motivation to stop the certification, and whose conduct on January 6 was very similar—counsels in favor of an upward variance here.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[9] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement."

---

[9] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

*See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Rae must pay $2,000 in restitution, which reflects in part the role Rae played in the riot on January 6.[10] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.)   Rae's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 241.

## VIII.   FINE

Rae's convictions for violations of 18 U.S.C. § 231(a)(3) and 18 U.S.C. § 1752(a)(1) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense

---

[10] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, Rae has not shown an inability to pay. Thus, pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $4,000 to $40,000. U.S.S.G. § 5E1.2(c).

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 24 months' imprisonment, 36 months' supervised release, $2000 in restitution, and the $125 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:    */s/ Isia Jasiewicz*
MONIKA (ISIA) JASIEWICZ
D.C. Bar No. 1024941
JASON B.A. MCCULLOUGH
DC Bar No. 998006; NY Bar No. 4544953
Assistant United States Attorneys
601 D Street NW
Washington, DC 20530
(202) 858-7233
isia.jasiewicz@usdoj.gov